IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Melinda J. Gibeau, | ) | C/A No.: 1:13-1860-RMG-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On May 5, 2006, Plaintiff filed applications for DIB and SSI in which she alleged her disability began on April 5, 2006.  Tr. at 100–07.  Her applications were denied initially and upon reconsideration.  Tr. at 62–67.  On March 2, 2009, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Edward T. Morriss.  Tr. at 14–41 (Hr'g Tr.).  The ALJ issued an unfavorable decision on April 14, 2009, finding that Plaintiff was not disabled within the meaning of the Act.  Tr. at 8–13.  Subsequently, the Appeals Council denied Plaintiff's request for review, and Plaintiff commenced an action in this court seeking review of the Commissioner's decision.  On February 3, 2012, the court reversed and remanded the matter for further proceedings.  Tr. at 499–505.

During the pendency of the appeal of this matter, Plaintiff filed a new application for benefits.  In a decision dated March 30, 2012, ALJ Regina L. Warren found the Plaintiff became disabled on April 14, 2009.  Tr. at 532–38.  Therefore, the only time period relevant to the present appeal is April 5, 2006, through April 13, 2009.

Following remand of this matter, ALJ Morriss held a second hearing on July 11, 2012.  Tr. at 461–85.  He issued a second unfavorable decision on August 8, 2012.  Tr. at 448–60.  Thereafter, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  Tr. at 432–34.  On July 8, 2013, Plaintiff filed this action seeking judicial review of the Commissioner's decision.  [Entry #1].

B.    Plaintiff's Background and Medical History

    1.    Background

Plaintiff was 39 years old at the time of the second hearing. Tr. at 466–67. She obtained her graduate equivalency diploma. Tr. at 467. Her past relevant work ("PRW") was in the food service industry and answering telephones. Tr. at 34, 467–68. She alleges she has been unable to work since April 5, 2006. Tr. at 103.

    2.    Medical History

Plaintiff was examined at the Grand Strand Regional Medical Center ("GSRMC") on September 25, 2005, for back pain and left leg pain. Tr. at 214. The treating physician diagnosed her with a mild case of sciatica, prescribed Vicodin, and instructed her to apply ice to the affected areas. *Id.*

On December 20, 2005, Plaintiff visited GSRMC and complained of nagging, aching right knee pain that was worse when she walked and had been present for about a month. Tr. at 212. She was diagnosed with probable arthritic pain and instructed to follow up with her primary care physician. *Id.*

Dr. Jerry A. Schexnayder of Strand Regional Specialty Associates examined Plaintiff on February 1, 2006. Tr. at 226–27. Plaintiff reported a three-month history of right knee pain during stair climbing and prolonged walking. *Id.* Examination revealed effusion in her knee and aspiration yielded 9 cc of fluid. *Id.* Dr. Schexnayder's initial impression was possible anti-inflammatory arthritis of Plaintiff's right knee. *Id.* The aspirated fluid tested positive for rheumatoid factor, and it was noted that Plaintiff's

sedimentation rate was elevated.  Tr. at 228, 231.  Dr. Schexnayder referred Plaintiff to Dr. Stephen G. Gelfand with Intracoastal Arthritis & Rheumatology.  Tr. at 246.

On February 16, 2006, Plaintiff reported to Dr. Gelfand that she had an eight-month history of polyarthralgias, which first started in her elbows and involved her shoulders, right knee, and hands, as well as pain and swelling in her right knee and hands over the prior three months.  Tr. at 246.  Examination revealed puffiness and tenderness in the joints in both of her hands; tenderness and synovial thickening of both wrists; slightly diminished range of motion in both wrists; decreased flexion in her left knee; synovitis, effusion, and limited flexion in her right knee; and tenderness and slightly limited range of motion in her right ankle.  Tr. at 247.  Dr. Gelfand's impression was that Plaintiff had probable rheumatoid arthritis.  *Id.*  He recommended additional laboratory testing, use of Prednisone and Methotrexate therapy, and physical therapy.  Tr. at 247–48.

On May 5, 2006, Dr. Gelfand noted that Plaintiff's rheumatoid arthritis was responding to treatment although her prescription of Methotrexate had gradually been increased.  Tr. at 242.  Even with the favorable response, Plaintiff noted continued pain and swelling in both hands and pain in her cervical spine region.  *Id.*  Testing from the prior visit revealed that Plaintiff's rheumatoid factor was markedly elevated.  *Id.*  Dr. Gelfand increased Plaintiff's Methotrexate dosage, added Skelactin, and suggested that Plaintiff might be a candidate for the addition of a biological agent to supplement the Methotrexate.  *Id.*

Treatment notes from Dr. Gelfand on June 23 and July 31, 2006, reveal that Plaintiff's rheumatoid arthritis was stable on her regimen of Methotrexate.  Tr. at 261–62.

Plaintiff continued to complain of some pain and swelling in her knees and ankles, as well as some limited range of motion in her neck with some spasms in her right trapezius. *Id.*

On July 26, 2006, Dr. George T. Keller, a state-agency physician, reviewed Plaintiff's file. Tr. at 251–58. In light of her current treatment plan, Dr. Keller opined that within twelve months of the alleged onset of disability date, Plaintiff would have the residual functional capacity ("RFC") to lift 20 pounds occasionally and 10 pounds frequently; stand/walk and sit for about six hours each in an eight-hour workday; occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; frequently balance; and occasionally stoop, kneel, crouch, and crawl. *Id.*

Plaintiff began seeing Dr. April Blue at Carolina Health Specialists as a primary care physician on August 4, 2006. Tr. at 292. Plaintiff complained of neck and upper back pain for the previous three months. *Id.* She also stated that she did not sleep well at night and reported fatigue, decreased appetite, and weight gain. *Id.* She experienced pain on flexion of the neck, but had no joint swelling, erythema, or deformity. Tr. at 292. Dr. Blue noted that Plaintiff was suffering from depression that might be related to her untreated hypothyroidism. *Id.* Images of Plaintiff's spine revealed no acute findings in the thoracic or cervical spines, normal height and alignment of the thoracic vertebrae, no significant disc space narrowing, and no lesions. Tr. at 286–87.

On August 18, 2006, Plaintiff again visited Dr. Blue, complaining of chronic neck pain, radiating to the arm. Tr. at 291. After viewing the images of Plaintiff's spine, Dr. Blue noted that there had been no changes since 2003. *Id.* Dr. Blue ordered an MRI and

noted that Plaintiff could consider physical therapy, pending the results. *Id.* On September 21, 2006, Dr. Blue examined Plaintiff, noted that her obesity was improving, and counseled her on continued weight loss. Tr. at 290.

On December 1, 2006, Dr. Katrina B. Doig, a state-agency physician, reviewed Plaintiff's file and reached the same conclusions as Dr. Keller. Tr. at 293–300. Dr. Jeffrey Vidic, Ph.D., a state-agency psychologist, reviewed Plaintiff's records and completed a Psychiatric Review Technique form on December 5, 2006. Tr. at 301–14. He opined that Plaintiff had depression, but did not have a severe mental impairment. Tr. 301, 304. He further opined that Plaintiff had mild restriction of activities of daily living ("ADLs"); moderate difficulty in maintaining social functioning; moderate difficulty in maintaining concentration, persistence, or pace; and no episodes of decompensation. Tr. at 311.

Plaintiff transferred her primary care to South Strand Internists and was initially seen by Dr. Brian Adler and Candyce McLeod, MSN, ARNP on July 21, 2008. Tr. at 357–58. Plaintiff stated that she continued to have chronic joint and muscular pain all over her body; pain in her neck, shoulders, back, and hips; depression; and chronic fatigue. Tr. at 357. Physical findings included morbid obesity, swelling in her wrists and hands, crepitus in her right knee, and multiple trigger points. Tr. at 358. Plaintiff was diagnosed with polyarthralgia, chronic insomnia and fatigue, morbid obesity, and depression. *Id.* She was referred for a sleep study. *Id.*

On August 20, 2008, Plaintiff presented to South Strand Internists, complained of pain all over her body, and received a prescription for Lyrica. Tr. 356.

6

On September 10, 2008, treatment notes from South Strand Internists indicate that Plaintiff complained of headache, back pain when walking, and depression. Tr. at 355. Images of Plaintiff's spine and sacroiliac joints taken on this day revealed no abnormalities. Tr. at 328–29. Plaintiff stated that she had tried to slice her wrists twice, but was not sure if she wanted to hurt or kill herself. Tr. at 355. She stated that she had no current plans to hurt herself. Tr. at 355. Plaintiff explained that she was stressed about bills and her 15-year-old daughter being pregnant. *Id.* Treatment notes indicate that Plaintiff would be sent to a psychiatrist. *Id.*

On September 12, 2008, Plaintiff complained that Seroquel made her groggy, but said she was sleeping better. Tr. at 354. On September 17, 2008, Plaintiff complained of edema in her hands and feet, as well as low back pain. Tr. at 353. She was diagnosed with depression and her Seroquel prescription was increased. *Id.* A lumbar spine MRI on October 1, 2008, revealed early degenerative changes at L5–S1. Tr. at 331.

On October 9, 2008, Plaintiff informed her providers at South Strand Internists that she experienced headaches and face flushing. Tr. at 352. She reported blurry vision and occasional vomiting. *Id.* Her rheumatoid arthritis was noted to be "OK." *Id.*

On November 11, 2008, Plaintiff saw Dr. R.R. Tupton, III, and complained of increasing blurriness in her eyes over the prior two months. Tr. at 371. Examination revealed decreased tearing in her eyes. *Id.* Dr. Tupton's assessment was questionable early Sjorgrens Syndrome, unspecified adverse effect of drugs, and Hydroxycholoroquine toxicity. Tr. at 372. He prescribed eye drops with a plan to consider eye plugs or prescribing Restasis upon her return if no improvement was noted. *Id.*

7

On November 11, 2008, Plaintiff returned to South Strand Internists complaining of low back pain and it was noted that she could not afford physical therapy for her back. Tr. at 351.  She later attended physical therapy from January 9 through February 6, 2009. Tr. at 361–70.  On January 22, 2009, she reported to providers at South Strand Internists that she had increased swelling over the prior couple of weeks in her feet and knees.  Tr. at 350.  Her weight was reported to be 289 pounds.  *Id.*

Plaintiff was examined by Dr. James W. Thrasher with the Department of Mental Health on January 13, 2009.  Tr. at 347–48.  Plaintiff reported she had battled depression for nearly twenty years and had been involuntarily hospitalized twice, once in Charleston and once in Columbia, for mental health reasons.  Tr. at 347.  She reported that when she was depressed she became short tempered, emotional, and tearful with suicidal ideation. *Id.*  She said she heard voices in the past criticizing her and telling her to hurt herself.  *Id.* She indicated she was currently taking Bupropion and Quetiapine (Seroquel) for her mental condition.  *Id.*  Dr. Thrasher's diagnosed mood disorder with a global assessment functioning score ("GAF")[1] of 58.  Tr. at 348.  He prescribed Ziprasidone and discontinued Quetiapine.  *Id.*

On January 22, 2009, Plaintiff visited South Strand Internists and reported increased swelling.  Tr. at 350.  Her providers noted that she remained fairly stable with

---

[1] "Clinicians use a GAF to rate the psychological, social, and occupational functioning of a patient."  *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 597 n. 1 (9th Cir. 1999).

use of the medication Lyrica, but that her bipolar/manic symptoms had reportedly increased. *Id.* She was taken off of Wellbutrin. *Id.*

Plaintiff saw Dr. Thrasher again on February 13, 2009. Tr. at 345–46. Plaintiff noted that Ziprasidone had caused some edema and it was discontinued. Tr. at 346. She described temperamental mood swings, an inability to sleep at night, and fatigue. *Id.* Dr. Thrasher indicated that it was not clear if she was manic or hypomanic, but that she exuded symptoms of mood instability. *Id.* Her GAF score was 59 and she was prescribed Ariprazole for mood stabilization. Tr. at 345.

On May 20, 2009, Ms. McLeod at South Strand Internists completed an RFC questionnaire, which appears to have also been signed by Dr. Adler. Tr. at 385–90. In it, Ms. McLeod assessed a variety of functional limitations that would preclude full-time work. *Id.*

On July 23, 2009, Dr. Tipton noted some evidence of significant dry eye disease and recommended that Plaintiff begin Restasis to determine if there was any Plaquenil toxicity. Tr. at 678, 683. On August 3, 2009, visual fields were performed and revealed significant losses in a pattern similar to Plaquenil toxicity, although Dr. Tipton noted that the test was somewhat inconclusive. Tr. at 678. He recommended insertion of a punctual plug instead of Restasis because of her inability to obtain insurance coverage for Restasis. *Id.* A plug was inserted in each eye on November 3, 2009. Tr. at 677.

C.    The Administrative Proceedings

1.    First Administrative Hearing

At the hearing on March 2, 2009, Plaintiff testified that she had three children ranging in age from 15 to 18.  Tr. at 17–18.  She stated she left her last job as the general manager of a restaurant because of pain and the physical demands of her job, which involved lifting up to 50 pounds and walking the majority of the time.  Tr. at 18–19.  She testified that she weighed 230 to 240 pounds at the time of the hearing and weighed about 150 pounds when she was working.  Tr. at 19.  She thought that her weight gain was caused by the medication she took, including Seroquel and Prednisone.  Tr. at 20.

Plaintiff testified that she had chronic pain and swelling in multiple joints, rheumatoid arthritis, blurry vision, and mood disorders.  Tr. at 20–22, 24–25, 28–29.  She said she could not clean her house, cook, or shop for groceries for long periods; could not sit, stand, or walk for more than a few minutes; and could not lift more than five pounds.  Tr. at 25–26, 28.  During a typical day, she said she sat in bed and home-schooled her daughter.  Tr. at 30.  She said she did not want to drive due to her eye condition.  *See* Tr. at 31.

Plaintiff stated that she could not perform her past telephone-answering job because of hand pain and trouble seeing things on a computer.  Tr. at 34.  Plaintiff testified that Methotrexate made her pain better to the point she could tolerate it, but the drug did not eliminate her pain completely.  Tr. at 33–34.

At the hearing, Plaintiff stated that her medications made her sick and tired, prevented her from sleeping, messed with her mind, and caused her to be unable to put words together.  Tr. at 22–24.

Plaintiff's father also testified at the hearing and supported her allegations of chronic pain, limited activities, and difficulty walking and driving.  *See* Tr. at 36–39.

### 2.    Second Administrative Hearing

At the hearing on July 11, 2012, Plaintiff testified that she last worked in 2006, but stopped working because she could not concentrate or focus, was in severe pain, and frequently missed work.  Tr. at 468.  She stated that she had rheumatoid arthritis that affected her knees, ankles, hands, shoulders, hip, and most of her joints.  Tr. at 469.  She said that her arthritis had gotten worse over the years and that, during the relevant time period, she could no longer walk long distances, cook, or do things for herself.  Tr. at 470.  Plaintiff stated she also had carpal tunnel syndrome, for which she had undergone three surgeries.  Tr. at 471–72.  She said that, during the relevant time period, her hands hurt a lot and she wore braces at night.  Tr. at 472.  She testified that she had plugs in her eyes to address her blurry vision.  Tr. at 473.  She estimated that her eyes were blurry about half the time and, while they were blurry, she could not drive or read the newspaper.  Tr. at 481.  She stated that the plugs provided her with tear ducts so that she no longer felt like she had sand in her eyes.  *Id.*  She said that she also experienced depression during the relevant time period and did not want to see or talk to anyone.  Tr. at 475.  She stated she had experienced depression since she was a teenager and had been

hospitalized when she was 16 and 17.  Tr. at 477.  She reported that her medications made her drowsy, nauseous, and forgetful.  Tr. at 474.

Plaintiff testified that, during the relevant time period, she stayed in bed most of the time.  *Id.*  She said that she stayed in bed because she was depressed and her medication made her sleepy.  Tr. at 475.  She said that her daily activities included watching television and talking to her children.  Tr. at 478.  She opined that she could not have performed a sedentary job because she could not focus and estimated that she could only sit down for 30 minutes to an hour before having to lie down.  Tr. at 479.  She recalled that her family first became concerned about her mental health in November 2008.  Tr. at 484.

3.    The ALJ's Findings

In his decision of August 8, 2012, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.
2.    The claimant did not engage in substantial gainful activity from April 5, 2006, the alleged onset date, through April 13, 2009, the date prior to the date she has been determined disabled (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3.    From April 5, 2006, through April 13, 2009, the claimant had the following severe impairments: rheumatoid arthritis, degenerative disc disease of the lumbar spine, obesity, and depression (20 CFR 404.1520(c) and 416.920(c)).
4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5.    After careful consideration of the entire record, I find that from April 5, 2006 through April 13, 2009, the claimant had the residual functional capacity to perform less than the full range of light work as defined in 20

CFR 404.1567(b) and 416.967(b). Specifically, the claimant could lift, carry, push and/or pull 20 pounds occasionally and 10 pounds frequently. She could sit for 6 hours in an 8-hour day, and stand and walk for 6 hours in an 8-hour day, with normal breaks. However, she could never climb ladders, ropes or scaffolds, and she could only occasionally climb ramps and stairs, stoop, kneel, crouch and crawl. The claimant could frequently balance. Additionally, she was limited to understanding, remembering and carrying out simple instructions.

6. The claimant was unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on June 14, 1973 and was 32 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules support a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant could perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 5, 2006, through April 13, 2009 (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 450–59.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1) the ALJ failed to properly evaluate the opinion of Plaintiff's treating physician; and

2) the ALJ's decision to reject Plaintiff's subjective complaints is not supported by substantial evidence.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions.  *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such

---

[2]  The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity.  20 C.F.R. § 404.1525.  If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria."  20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493

impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); § 416.920(a), (b), Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls*

---

U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

*v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.      The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is

substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Treating Physician Opinion

Plaintiff asserts that the ALJ improperly evaluated the joint opinion of Ms. McLeod, a nurse practitioner, and Dr. Adler, her supervising physician. [Entry #10 at 12–13]. The Commissioner responds that the ALJ's decision to accord the opinion little weight was reasonable. [Entry #15 at 10–14].

If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it will be given controlling weight. SSR 96-2p; *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and inconsistent with other substantial evidence in the record); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding a physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence). The Commissioner typically accords greater weight to the opinion of a claimant's treating medical sources because such sources are best able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). However, "the rule does not require that the testimony be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam).

17

Rather, "[c]ourts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654. The ALJ has the discretion to give less weight to the opinion of a treating physician when there is "persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d, 171, 176 (4th Cir. 2001). In undertaking a review of the ALJ's treatment of a claimant's treating sources, the court focuses its review on whether the ALJ's opinion is supported by substantial evidence, because the court's role is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589.

The opinion at issue is dated May 20, 2009, and provides that Plaintiff had been seen for fibromyalgia, osteoarthritis, and rheumatoid arthritis and that her other diagnoses included mood disorder, chronic fatigue and insomnia, morbid obesity, hypothyroidism, acid reflux, chronic venous insufficiency of lower extremities, and left shoulder pain due to a ganglion cyst. Tr. at 385. The opinion indicates that Plaintiff's prognosis is poor; her symptoms include multiple tender points, chronic fatigue, muscle weakness, subjective swelling, hand numbness and tingling, anxiety, panic attacks, and depression; her emotional factors contribute to the severity of her symptoms and functional limitations; and she did not appear to be malingering. Tr. at 385–86. Plaintiff was noted to have pain throughout her body that was precipitated by changing weather, fatigue, movement/overuse, cold, and stress. Tr. at 386. The opinion provides that Plaintiff is

incapable of even low stress jobs; is unable to walk without rest or severe pain; can sit for 30 minutes and stand for 15 minutes at a time; can stand or walk less than two hours intermittently in an eight-hour day; can sit about four hours intermittently in an eight-hour day; must walk for 10 minutes after a 30-minute period of working; and can lift 10 pounds occasionally and less than 10 pounds frequently. Tr. at 387–88. The opinion indicates that Plaintiff is not able to work and would miss more than four days of work per month as a result of her impairments or treatment. Tr. at 388–89. The opinion appears to have been completed by and is signed by Ms. McLeod. Tr. at 390. Beside Ms. McLeod's signature is an illegible signature that the parties agree is that of Dr. Adler. *Id.*; *see also* Entry #10 at 13, #15 at 12.

The ALJ stated that he considered the opinion of Ms. McLeod, but gave it little weight because (1) it was rendered after April 14, 2009, the date on which the claimant had been determined to be disabled by another ALJ, and (2) the relatively benign physical examinations and imaging studies prior to that time do not support Ms. McLeod's assessment. Tr. at 458.

Plaintiff first argues that the ALJ erroneously identified Ms. McLeod as the only author of the opinion rather than also attributing it to Dr. Adler. [Entry #10 at 13]. Plaintiff further argues that, as a result, it is unclear whether the ALJ evaluated the opinion as that of a treating physician. *Id.* Plaintiff contends that the standard used by the ALJ is especially unclear because just prior to evaluating the opinion at issue, the ALJ found that another nurse practitioner was not an acceptable medical source and afforded her opinion little weight. *Id.* The Commissioner argues that it was reasonable for the

ALJ not to identify Dr. Adler as one of the authors of the form because Plaintiff never identified Dr. Adler as one of her providers, his name is not printed on the questionnaire, and his signature is not legible.  [Entry #15 at 11–12].

The undersigned finds the Commissioner's arguments unavailing.  When Plaintiff established treatment at South Strand Internists, the names of both Dr. Adler and Ms. McLeod were printed on the treatment notes and both providers signed the notes.  Tr. at 358.  At subsequent visits, Dr. Adler signed off on the treatment notes.  Tr. at 350–56. Furthermore, in the district judge's order of February 3, 2012, remanding this matter, he identified Dr. Adler as a treating physician and stated that the ALJ should take care to weigh all medical opinions in light of the special considerations the regulations mandate for treating physicians.  Tr. at 503–04.  For these reasons, the undersigned concludes that the ALJ should have considered the opinion at issue as that of a treating physician.

Assuming the ALJ evaluated the opinion under the heightened standard required for treating physician opinions, the undersigned recommends a finding that his decision to accord the opinion little weight is not supported by substantial evidence.  The Commissioner concedes that it was improper for the ALJ to accord the opinion little weight because it was rendered after April 14, 2009, the date on which the claimant had been determined to be disabled by another ALJ.  [Entry #15 at 13, n.2].  The Commissioner's concession leaves as the only reason supporting the ALJ's decision to discount the opinion "the relatively benign physical examinations and imaging studies." Tr. at 458.

The reason offered by the ALJ is vague and fails to cite to specific supporting evidence.  These shortcomings, combined with the lack of clarity regarding the standard used by the ALJ in assessing the opinion, render the undersigned unable to determine whether the ALJ's decision to discount the opinion is supported by substantial evidence.  Therefore, the undersigned recommends this matter be remanded with instructions that the ALJ consider the opinion of Ms. McLeod and Dr. Adler as required by the authority set forth above.[4]

2.    Credibility

Plaintiff also argues that the ALJ's decision to discount her subjective complaints is not supported by substantial evidence.  [Entry #10 at 18].  The Commissioner contends the ALJ reasonably declined to fully credit Plaintiff's allegations.  [Entry #15 at 16].

Prior to considering a claimant's subjective complaints, an ALJ must find a claimant has an underlying impairment that has been established by objective medical evidence that would reasonably be expected to cause subjective complaints of the severity and persistence alleged.  *See* 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p; *Craig*, 76 F.3d 585, 591–96 (4th Cir. 1996) (discussing the regulation-based two-part test for evaluating pain).  The first part of the test "does not . . . entail a determination of the intensity, persistence, or functionally limiting effect of the claimant's asserted pain."  76 F.3d at 594 (internal quotation omitted).  Second, and only after claimant has satisfied the

---

[4] The undersigned notes that the ALJ did not employ the testimony of a vocational expert ("VE") despite his inclusion of non-exertional limitations in Plaintiff's RFC.  On remand, the undersigned recommends directing the ALJ to consider whether VE testimony is necessary at step five.

threshold inquiry, the ALJ is to evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work." *Id.* at 595. This second step requires the ALJ to consider the record as a whole, including both objective and subjective evidence, and SSR 96-7p cautions that a claimant's "statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." SSR 96-7p, ¶ 4.

If an ALJ rejects a claimant's testimony about her pain or physical condition, he must explain the bases for such rejection to ensure that the decision is sufficiently supported by substantial evidence. *Hatcher v. Sec'y, Dep't of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir. 1989). "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, ¶ 5. In evaluating the intensity, persistence, and limiting effects of an individual's symptoms and the extent to which they limit an individual's ability to perform basic work activities, adjudicators are to consider all record evidence, which can include the following: the objective medical evidence; the individual's ADLs; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual

receives or has received for relief of pain or other symptoms; any measures other than treatment the individual uses to relieve pain or other symptoms; and any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. SSR 96-7p.

Here, after setting forth the applicable regulations, the ALJ considered Plaintiff's subjective claims under the required two-step process. *See Craig*, 76 F.3d at 591–96. The ALJ found Plaintiff's impairments could reasonably be expected to cause some of the symptoms she alleged, but determined that Plaintiff's testimony "concerning the intensity, persistence and limiting effects" of her symptoms was "not credible to the extent" the testimony was inconsistent with the ALJ's determination of her RFC. Tr. at 457.

In discounting Plaintiff's credibility, the ALJ stated that although Plaintiff testified to numerous medication side effects (including fatigue, nausea, drowsiness, concentration, and memory problems), there is no indication that she related the alleged symptoms to her treating physicians on a recurring basis or requested a change of her medications. Tr. at 457. With regard to Plaintiff's depression, the ALJ noted that Plaintiff worked for a majority of the 20 years that she contends she has been depressed and had received only infrequent and conservative treatment of her psychiatric symptoms. Tr. at 456–57. With regard to Plaintiff's physical complaints, the ALJ referenced records stating that her rheumatoid arthritis was stable on medication; that x-rays of her spine in 2006 and 2008 revealed no abnormalities; and that there was little

evidence showing that Plaintiff's obesity affected her ability to move about, ambulate, or perform work activity.  Tr. at 455–56.

Plaintiff asserts that there is sufficient support for adverse medication side effects in the record and cites to records documenting complaints of fatigue and decreased sleep at night.  [Entry #10 at 18].  A review of the record reveals that Plaintiff did complain of fatigue and sleeplessness, but did not complain of the other side effects she alleges. Although the ALJ erred in stating that Plaintiff had not complained of fatigue, the undersigned recommends finding this error harmless because the ALJ offered several other reasons for discounting Plaintiff's credibility.  *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (affirming denial of benefits where the ALJ erred in evaluating a claimant's pain because "he would have reached the same result notwithstanding his initial error").

In the remainder of her argument, Plaintiff references, without citation, records that she believes provide support for her objective complaints.  [Entry #10 at 17–18]. However, it is not within the court's province to reweigh the evidence.  *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (holding that it is the ALJ's responsibility, not the court's, to determine the weight of evidence and resolve conflicts of evidence).

Based on the foregoing, the undersigned recommends finding that the ALJ's decision to discount Plaintiff's credibility is supported by substantial evidence.  However, in light of the recommendation that the case be remanded for further consideration of the treating physician opinion, the undersigned further recommends that, on remand, the ALJ

be directed to revisit his finding regarding the supportability of Plaintiff's alleged medication side effects.

## III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law.  Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence.  Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

June 3, 2014                              Shiva V. Hodges
Columbia, South Carolina                 United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).